**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID L. MILLINDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 1:18-cv-01042-STA-cgc** |
| | ) | |
| **JOSEPH HUDGINS, JR., and** | ) | |
| **DECATUR COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

The informer's privilege is a long-standing rule of law that allows the government "to withhold from disclosure the identity of persons who furnish information" concerning criminal activity to law enforcement. *State v. Ostein*, 293 S.W.3d 519, 527 (Tenn. 2009) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). This case presents a troubling example of the government disregarding the informer's privilege and disclosing the identity of an informer to the suspects he had reported to the police. Before the Court is Defendants Joseph Hudgins, Jr. and Decatur County, Tennessee's Motion for Summary Judgment (ECF No. 34) filed on July 15, 2019. Despite a failure to safeguard the informer's anonymity in this case, Defendants' Motion must be **GRANTED**.

### BACKGROUND

This is an action under 42 U.S.C. § 1983 for the violation of Millinder's constitutional rights. Millinder alleges that he acted as an informant to report drug trafficking activity in Decatur County, Tennessee. Hudgins, who was at the time a Decatur County law enforcement official, took Millinder's tip and used the information to obtain a search warrant that led to two arrests and the

bust of a drug, gambling, and alcohol ring. Millinder alleges that Hudgins created a risk to his personal safety by placing Millinder's written statement and personal identifying information in an investigative file that was later produced to the district attorney's office. The assistant district attorney prosecuting the case then produced the file with Millinder's statement and information to the attorney for the suspects in the course of discovery in the case against the suspects, thereby allowing the suspects to learn about Millinder's identity and involvement in the investigation of their crimes. Hudgins and Decatur County now seek summary judgment on Millinder's claims, arguing that Millinder cannot prove that Hudgins violated his rights. Defendants argue in the alternative that Hudgins is entitled to qualified immunity.

## I.     Factual Background

The Court first considers whether a genuine issue of material fact exists to preclude judgment as a matter of law at this stage of the case. In support of their Motion for Summary Judgment, Defendants have asserted that a number of facts are undisputed for purposes of Rule 56. Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the evidence fails to establish a genuine

dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

The Court finds that the following facts are not in dispute for purposes of deciding Defendants' Rule 56 Motion. After his wife discovered marijuana in their son's pants pocket, Plaintiff David Millinder decided to conduct his own investigation into the source of the drugs. (Defs.' Statement of Undisputed Fact ¶¶ 1, 2; ECF No. 35-2). Millinder asked his nephew where a teenager could buy drugs in the area, and his nephew took him to Billy Bob's Bar. (*Id*. ¶ 3.) There, Millinder observed his nephew purchase $1,200 worth of marijuana from Jeff Hopper. (*Id*. ¶ 4.) Having witnessed an illegal drug transaction, Millinder contacted Defendant Joseph Hudgins, a criminal investigator employed at the Decatur County Sheriff's Department. (*Id*. ¶¶ 5-7.) Hudgins asked Millinder to meet him under a bridge in a secluded location for safety reasons. (Pl.'s Statement of Fact ¶ 12, ECF No. 38-1.)

On February 1, 2016, Millinder met Hudgins, reported what he had observed, and completed a written statement. (Defs.' Statement of Undisputed Fact ¶ 10; Pl.'s Statement of Fact ¶ 15.) Millinder wrote in his statement that he had seen "a pound of weed bought from Jeff Hopper's house" within the last 24 hours. (Defs.' Statement of Undisputed Fact ¶ 11.)[1] Plaintiff's report was consistent with other information Hudgins had previously received about Jeff Hopper. (Pl.'s Statement of Fact ¶¶ 13, 18.) So using Millinder's information, Hudgins obtained a search warrant for Hopper's home. During the search of Hopper's residence, Hudgins

---

[1] Plaintiff testified in his deposition that he had seen the buy at Billy Bob's Bar but then wrote in his statement to Hudgins that he had witnessed a buy at Hopper's house. *Cf*. Millinder Dep. 31:20-32:23, Mar. 4, 2019 (ECF No. 35-5); Millinder Statement, ex. 1, Hudgins Dep., Mar. 4, 2019. It is not clear to the Court whether Plaintiff observed two different transactions or whether Millinder was referring to the same locations. In any event, the parties have not identified this as a genuine dispute of material fact, and the fact does not appear to be relevant to the issues presented in Defendants' Motion for Summary Judgment.

discovered marijuana, firearms, and drug paraphernalia. (*Id*. ¶ 22.) Based on the evidence recovered during the search, police then obtained arrest warrants for Hopper and his girlfriend Judy Mills and made the arrests at Billy Bob's Bar. (*Id*. ¶ 25.) As part of a search of the bar incident to the arrests, police found more weapons, gambling machines, and evidence of illegal alcohol sales. (*Id*. ¶ 26.) Hopper and Mills were both charged and eventually pleaded guilty to avoid trial. (*Id*. ¶ 39.)

Millinder's allegations against Hudgins and Decatur County in this case stem from the handling of his February 2016 statement reporting Hopper's illegal activities. According to Millinder, Hudgins assured him that his identity would remain confidential and that his statement would be stored in a locked cabinet, though Defendants add that the state would have called Millinder as a witness if the case had gone to trial. (*Id*. ¶ 17.) A confidential informant usually has some connection to or involvement with the criminal enterprise he reports to the police; whereas, a citizen informant has no such connection. (*Id*. ¶¶ 6-8.) Even though there was no evidence Millinder was involved in Hopper's criminal activity, Hudgins treated Millinder like a confidential informant, not a citizen informant. (*Id*. ¶¶ 9, 15.) Hudgins assigned Millinder a confidential informant number and required him to complete the paperwork for confidential informants, all out of concern over Millinder's motives in reporting Hopper, even after Millinder's tip was corroborated by what the police found at Hopper's home and Billy Bob's Bar. (*Id*. ¶¶ 15, 16.)

Under Decatur County policies, a source's statements and personal information were deemed confidential. (*Id*. ¶ 10.) Hudgins testified that while employed by Decatur County, his practice was to keep confidential informant statements in a confidential file separate from his investigative file. (*Id*. ¶ 27.) Hudgins did not produce confidential files to the District Attorney,

only investigative files. (*Id*. ¶ 28.) Before turning over an investigative file to the District Attorney, Hudgins would typically review the file and remove or redact any personal or confidential information. (*Id*. ¶¶ 11, 29.) Although Hudgins viewed Millinder like a confidential informant, Hudgins did not follow his normal practice of storing Millinder's statement in a confidential file. Instead, Hudgins kept Millinder's informant statement in the investigative file. (*Id*. ¶ 32.) In Hudgins's opinion, Millinder's statement was "the basis for the whole case." (Defs.' Statement of Undisputed Fact ¶ 13.)

When Hudgins left his employment at the Decatur County Sheriff's Department in October 2016, a copy of Millinder's statement incriminating Hopper was still in Hudgins's investigative file. (*Id*. ¶ 17.) The parties dispute how exactly the investigative file containing a copy of Millinder's written statement came to the District Attorney's Office. Hudgins claims that all of his investigative files and his confidential files remained in the custody of the Decatur County Sheriff's Department at the time of his resignation. (*Id*. ¶ 18.) Hudgins denies that he personally provided a copy of the investigative file containing Millinder's statement to the DA. (*Id*. ¶ 22.) Millinder contends that Hudgins's other testimony shows Hudgins had already turned the investigative file over to the DA before he left the Sheriff's Department. In any event, it is undisputed that Hudgins did not disclose Millinder's identity or produce any information about Millinder to the suspects themselves, Hopper and Mills. (*Id*. ¶¶ 23-24.)

The Assistant DA responsible for the prosecution against Hopper and Mills was Lisa Miller. (*Id*. ¶¶ 47, 60.) Miller was employed by the State of Tennessee in Tennessee's 24th Judicial District, which included Decatur County. (*Id*. ¶¶ 48, 49.) Miller testified that law enforcement generally provided her with a complete file for each case, including the name of any confidential informant. (*Id*. ¶¶ 51-53.) During Miller's tenure, her District followed an open file

policy where criminal defense attorneys were granted full access to all materials in the investigative file. (*Id*. ¶ 54-55.) This meant that an attorney for a defendant would have access to the name, date of birth, and address of any individual identified in a criminal investigative file. (*Id*. ¶ 57.) Miller testified that her practice was not to remove any information identifying a confidential informant. (*Id*. ¶ 58.) In Miller's opinion, a defense attorney had the right to discover information about a confidential informant so that the attorney could question the informant as part of the defense and independently ascertain whether the attorney had any ethical conflict in the case based on the informant's involvement. (*Id*. ¶ 59.) Attorney Stephen Milam represented Hopper and Mills. (*Id*. ¶ 61.) Milam filed a motion for discovery and inspection on behalf of both Hopper and Mills and was granted full access to the investigative file for each defendant. (*Id*. ¶¶ 62-66.) Miller testified that if Millinder's written statement was contained in the investigative file, then Milam would have received it as part of the production of the investigative file. (*Id*. ¶¶ 68-69.)

At some time after he had made his confidential report to the authorities, Millinder and his family endured a pattern of anonymous harassment and came to suspect that both Hopper and Mills had learned about Millinder's role as an informer. (*Id*. ¶ 40.) Unknown individuals vandalized the mailbox at the address listed on Millinder's confidential statement. (*Id*. ¶ 41.) On more than one occasion, shots were fired at Millinder's house. (*Id*. ¶ 42.) Millinder and his son experienced instances of unidentified individuals calling them "snitch." (*Id*. ¶ 44.) Millinder's wife once saw Hopper himself drive up to the home, stop his car, and point a finger at her. (*Id*. ¶ 43.) Millinder's brother received a text message from Hopper inquiring about Millinder's

involvement in the investigation.  (*Id*. ¶¶ 33-34.)  Although no one was ever physically harmed[2] and Millinder could not prove that Hopper or Mills was behind any of the anonymous the incidents, Millinder and his family eventually moved out of fear for their safety.  (*Id*. ¶¶ 31-32, 41-42, 45.)

## II.      Defendants' Motion for Summary Judgment

In their Motion for Summary Judgment, Defendants argue that Millinder cannot prove his § 1983 claims as a matter of law.  First, Millinder cannot show that he suffered any actual injury. Millinder has no proof that Hopper or Mills has personally participated in or caused any of the property damage or harassment experienced by Millinder's family.  There is no evidence Hopper or Mills has personally threatened or physically harmed Millinder or any member of his family. As such, Millinder has failed to show that any harm is traceable to Hudgins or Decatur County. Second, there is no proof that Hudgins took any affirmative action to create or increase a risk of harm to Millinder from a third party.  Hudgins denies that he personally delivered a copy of Millinder's informant statement to the District Attorney or Hopper or Mills.  Even if Hudgins' decision to include Millinder's statement in the investigative file and produce the file to the DA had violated Millinder's rights, such a right was not clearly established at the time of these events.  Hudgins simply did what a reasonable law enforcement officer would have done under the same circumstances.  As a result, Defendants argue that the Court should grant them summary judgment on Millinder's § 1983 claims and decline to exercise supplemental jurisdiction over his state law claims.

Millinder has responded in opposition.  Millinder contends that Hudgins created or

---

[2] There is also evidence that Millinder's wife suffered a stroke, though Defendants object that Millinder has offered no opinion evidence to connect the cause of the stroke to the stress Mrs. Millinder experienced as a result of the alleged harassment.  (*Id*. ¶ 47.)

increased the risk of danger to him in two ways: by keeping Millinder's confidential statement in the investigative file and then by turning the file over to the DA. Hudgins not only failed to protect Millinder and hold his report in confidence but also allowed the information to be disclosed to the subjects of the investigation themselves and did so with deliberate indifference to Millinder's safety. Hudgins testified that he kept Millinder's statement in the investigative file because he was concerned Millinder had a vendetta against Hopper and believed Millinder's statement was the basis for the case against Hopper. But Millinder counters that the discovery of the contraband corroborating Millinder's account of drug trafficking should have dispelled whatever concerns Hudgins had about Millinder's motives. And it was the fruit of the searches that made out the case against Hopper and Mills, not Millinder's tip. Millinder further notes that under Tennessee law an accused has no right to discover the identity of an informant. According to Millinder, Hudgins had ample time to reach these conclusions and should have known to remove the statement from the investigative file. His failure to do so exhibited deliberate indifference to the risk of danger to Millinder. Millinder concludes by arguing that the contours of his privacy rights were established under Sixth Circuit precedent. Therefore, Defendants' Rule 56 Motion should be denied.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a

motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court does not engage in "jury functions" like "credibility determinations and weighing the evidence." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson*, 477 U.S. at 255). Rather, the question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson*, 477 U.S. at 252. In other words, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In this case Millinder would hold Hudgins liable pursuant to 42 U.S.C. § 1983, which creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). Section 1983 imposes liability on a "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. Under § 1983, the Court's "threshold inquiry" is "to identify the specific constitutional right" at issue and then apply the relevant elements and rules of an action to vindicate the right. *Manuel*, 137 S. Ct. at 916 (quotation omitted). The constitutional right at stake here is the Due Process Clause of the Fourteenth Amendment.

"The Due Process Clause of the Fourteenth Amendment does not impose upon the state an affirmative duty to protect its citizens against private acts of violence, but rather, places limitations on affirmative state action that denies life, liberty, or property without due process of law." *Barber v. Overton*, 496 F.3d 449, 453 (6th Cir. 2007) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1998)). The state created danger doctrine exists as an exception to this general rule. "The state-created danger doctrine allows plaintiffs to bring due process claims under § 1983 for harms caused by private actors—an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors." *Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019) (citing *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008)). So "while the state does not shoulder an affirmative duty to protect its citizens from acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its affirmative acts." *Barber*, 496 F.3d at 453 (quoting *Kallstrom*, 136 F.3d at 1066). The state created danger doctrine requires a "demanding standard" of proof. *Romain*, 935 F.3d at 492 (citing *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006)).

## ANALYSIS

Regardless of his motives for cooperating with authorities, an informer "will usually condition his cooperation on an assurance of anonymity–to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him." *Ostein*, 293 S.W.3d at 526–27 (quoting 8 Wigmore, *Evidence* § 2374 at 762 (McNaughton rev. 1961)). There is no real dispute that Millinder's anonymity was not adequately protected in this case. The proof viewed in the most favorable light to Millinder shows that Millinder came forward and made a report to law enforcement about illegal drug

trafficking activities in his community. Millinder's tip allowed law enforcement to obtain a search warrant, resulting in two arrests and the takedown of a drug, gambling, and alcohol operation. Millinder received what seemed to be a straightforward assurance from the investigator that his identity as a tipster would remain confidential.

Nevertheless, Millinder's name, address, date of birth, and social security number were eventually released to the very offenders who had been arrested as a result of his tip. The disclosure of Millinder's name and information was not just an honest mistake or inadvertence. Hudgins, the investigator, included Millinder's statement and identifying information in the investigative file with the knowledge that the information would go on to the District Attorney. Hudgins was of the opinion that Millinder's tip was critical to the case somehow, a curious conclusion in light of the fact that Hudgins's general practice was to withhold confidential informant information from the DA. And the case against the suspects, Hopper and Mills, was obviously not Millinder's tip but the contraband itself, that is, the drugs, guns, gambling machines, and illegal alcohol found during the bust.

For her part, Miller, the Assistant DA, testified to her legal opinion that the defense was entitled to discover Millinder's identity, when the opposite is settled law in Tennessee. *Ostein*, 293 S.W.3d at 527 (noting that Tennessee recognizes the informer's privilege and collecting cases). Specifically, a criminal defendant has no right to discover an informant's identity where like Millinder "the informant only provided information used to obtain a search warrant." *Id*. at 528 (citing, *Wells v. State*, 509 S.W.2d 520, 521 (Tenn. Ct. App. 1973)). This means under Tennessee law, the defense would not have been entitled to the discovery of Millinder's identity because Millinder's tip was just the basis for the search warrant, at least as far as the facts at summary judgment show.

Viewing all of this evidence in a light most favorable to Millinder, a reasonable jury could conclude that Millinder's statement and identifying information should have never been disclosed in the criminal proceedings against Hopper and Mills.

## I.     State Created Danger

However, it does not necessarily follow from that conclusion that Hudgins violated Millinder's constitutional rights or should be liable to Millinder under § 1983 for revealing his identity and creating a specific danger to his safety.  In order to hold Hudgins liable under a state created danger theory, Millinder has to prove three elements: "(1) an affirmative act by [Hudgins] which either created or increased the risk that [Millinder] would be exposed to an act of violence by a third party; (2) a special danger to [Millinder] wherein [Hudgins]'s actions placed [Millinder] specifically at risk, as distinguished from a risk that affects the public at large; and (3) [Hudgins] knew or should have known that [his] actions specifically endangered [Millinder]." *Nelson v. City of Madison Heights*, 845 F.3d 695, 700 (6th Cir. 2017).  The Court can assume without deciding that Millinder can satisfy the second element: Millinder was specifically at risk based on his willingness to act as an informant and the release of his identity to the suspects on whom he had informed.

The Court holds, however, that proof of the other two elements is lacking.  The first element, whether Hudgins's actions created or substantially increased a risk of harm to Millinder, is essentially a question of causation.  The state created danger doctrine does not require strict but-for causation, *Barber*, 496 F.3d at 453, and in one sense, there is no real doubt that Millinder was "safer before the state action than he was after it." *Romain*, 935 F.3d at 492 (quoting *Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007)).  But did Hudgins create a risk to Millinder just by taking down his information and then by including his identifying

information and his statement in an investigative file that went to the District Attorney? The Court is hard pressed to conclude that a police investigator creates or substantially increases the risk to an informer by disclosing the informer's identity to a prosecutor. And that is all the proof actually demonstrates in this case.

Even if Hudgins made a deliberate decision to provide Millinder's information to the DA and regardless of whether Hudgins personally gave the DA the investigative file,[3] the Court cannot say that Hudgins' affirmative act created risk for Millinder or "substantially" increased an already existing risk. *Summar v. Bennett*, 157 F.3d 1054, 1059 n.2 (6th Cir. 1998). If anything, the District Attorney's open file policy and failure to uphold the informer's privilege created or substantially increased the risk to Millinder. Millinder cannot hold Hudgins vicariously liable for the actions of the District Attorney. *Gardner v. Evans*, 920 F.3d 1038, 1051 (6th Cir. 2019) (holding that "[e]ach defendant's liability must be assessed individually based on his own actions") (quotation omitted).

Perhaps more important, Millinder has cited no authority to support a state created danger claim based on a detective or investigator disclosing the name of an informant or tipster to the prosecution. In fact, the Sixth Circuit reached the opposite result in *Summar v. Bennett*, 157 F.3d 1054 (6th Cir. 1998). The police officer in *Summar* had disclosed a confidential informant's name and role in an investigation to the district attorney. *Summar*, 157 F.3d at 1056. The district attorney went on to name the informant in an indictment against another suspect. *Id.* Within days of the indictment, the informant was murdered in retaliation on the orders of the

---

[3] As the Court has already noted, the parties dispute whether Hudgins personally transferred the investigative file to the DA prior to the end of his tenure at the Decatur County Sheriff's Department. Hudgins says the file was still with the Sheriff's Department at the time of his resignation; Millinder says it was already in the possession of the DA. The Court finds that even accepting Millinder's version as true, the fact does not prove that Hudgins "disclosed" Millinder's identity or "created" any risk to Millinder.

indicted suspect. *Id.* The Sixth Circuit concluded that the officer did not have a duty to protect the informant or withhold his identity from the prosecutor based on a "special relationship" between an informant and the police.[4] The Court of Appeals specifically declined to follow a line of cases from other Circuits recognizing the "special relationship" doctrine, finding them distinguishable based on the fact that the informant in *Summar* had voluntarily agreed to act as an informant and knew the risks working as an informant and associating with criminals posed to his safety. *Id.* at 1059–60.

While it is true that *Summar* was a special relationship case and not a state created danger case, the panel briefly considered whether the facts of the case supported the state created danger theory. In a footnote, the Court of Appeals noted its recent adoption of the state created danger doctrine in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) but "reject[ed] the proposition" that a police officer's act of disclosing an informant's identity to a prosecutor could "substantially increase the likelihood that a private actor would deprive [the informant] of [his] liberty interest in personal security." *Summar*, 157 F.3d at 1059 n.2 (citing *Kallstrom*, 136 F.3d at 1067). This was the extent of the panel's discussion of the state created danger theory. *Summar*'s summary dismissal of the state created danger doctrine under facts very similar to those in this case is inconsistent with Millinder's claim that Hudgins's act of keeping Millinder's statement and identifying information in a file that would be produced to the district attorney created or substantially increased a danger to Millinder. *See also Nichols v. Fernandez*, 686 F. App'x 532, 534–35 (9th Cir. 2017) ("[T]here was no established law that a police officer violates

---

[4] The Sixth Circuit has described the special relationship doctrine and the state created danger doctrine as the two exceptions to the general rule that the government has no duty to protect citizens from private actors. *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 853 (6th Cir. 2016) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)).

the state-created danger doctrine" by including an informant's name in a police report.). Therefore, the Court holds that Millinder has failed to prove one of the essential elements of his state created danger claim.

For similar reasons, Millinder has not satisfied his burden to prove the third element of his claim, that Hudgins knew or should have known that his actions put Millinder at risk. In order to prove that Hudgins acted with the requisite degree of culpability, Millinder must show that Hudgins's conduct was "so egregious that it can be said to be arbitrary in the constitutional sense." *Guertin v. State*, 912 F.3d 907, 924 (6th Cir. 2019) (citing *Schroder v. City of Ft. Thomas*, 412 F.3d 724, 730 (6th Cir. 2005)); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 847 (1998)) (internal quotation marks omitted). And because Hudgins was not forced to make a split-second decision and had the "opportunity for reflection and unhurried judgments," the deliberate indifference standard applies. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006)). ("The guiding principle seems to be that a deliberate-indifference standard is appropriate in settings that provide the opportunity for reflection and unhurried judgments, but that a higher bar may be necessary when opportunities for reasoned deliberation are not present.") (citations and internal quotation marks omitted).

In the separate context of the Eighth Amendment, "the deliberate indifference standard describes a state of mind more blameworthy than negligence," meaning the government "official knows of and disregards an excessive risk to" the safety of another. *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019). Millinder has cited no legal authority, and the Court is aware of none, for the proposition that a police investigator acts with deliberate indifference to the safety of an informant by recording the informant's identity and disclosing it to a prosecutor. Millinder has only shown that (1) Hudgins believed Millinder's identity was significant to the case against

Hopper and Mills and (2) Hudgins knew the investigative file containing Millinder's statement and identity would end up in the DA's office. Nothing from these facts tends to show that by keeping Millinder's information in the file, Hudgins knowingly disregarded an excessive risk to Millinder's safety. Even if Hudgins made a mistake in judgment about the legal significance of Millinder's role in the investigation, violated county policy by disclosing Millinder's information, or wrongly assumed the DA would handle the information properly, "simply making bad choices does not rise to the level of deliberate indifference." *Guertin*, 912 F.3d at 924. Otherwise, there is no evidence that Hudgins exhibited deliberate indifference to Millinder's safety and the consequences of leaving Millinder's statement and identifying information in the investigative file. Therefore, the Motion for Summary Judgment must be granted.

Millinder argues that the state lacked a compelling interest in the district attorney disclosing the identity of an informer to the defense, especially in light of the informer's privilege. Pl.'s Mem. in Opp'n 13–14. Be that as it may, Millinder seeks to hold Hudgins liable, not the DA. Furthermore, because the Court holds that Millinder has not proven a constitutional violation, the Court need not balance Millinder's rights against the state's interests in disclosure. In *Kallstrom*, the Sixth Circuit held that undercover police officers had a constitutional privacy right in the non-disclosure of their true identities and other personal information to criminal defendants and that a city's policy of disclosing the information was not narrowly tailored to serve a compelling government interest. *Kallstrom*, 136 F.3d at 1064–65. Hudgins does not specifically argue how his decision to disclose Millinder's identity to the District Attorney was narrowly tailored to further a compelling state interest. *See Nelson*, 845 F.3d at 701 n.4 (citing *Kallstrom* and noting that a defendant's failure to address the compelling interest amounted to a

waiver of the issue). Still, in the absence of proof to make out the elements of Millinder's Fourteenth Amendment state created danger claim, the Court need not reach the question of whether Hudgins's actions were narrowly tailored to serve a compelling state interest in disclosure.

## II.     Qualified Immunity

Even if Millinder could prove the elements of a Fourteenth Amendment state created danger claim against Hudgins, Hudgins argues that he is entitled to qualified immunity on the claim. "The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011) (internal quotation marks omitted). A right is clearly established if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Calif. v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). Practically speaking, "a body of relevant case law is usually necessary to clearly establish the answer." *Id.* at 504 (quoting *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 581 (2018)). The Supreme Court has assumed without deciding that a decision of a court of appeals may count as clearly established law for purposes of qualified immunity. *Id*. at 503 (citing *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)); see also *Guertin*, 912 F.3d at 932 ("[W]e must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.").

Even if Millinder could prove that Hudgins violated his constitutional rights, the Court holds that the precise contours of an informant's right not to have law enforcement reveal his identity to a prosecutor were not clearly established at the time. For reasons the Court has already explained, the Sixth Circuit's decision in *Summar* arguably shows that a reasonable officer would have believed the disclosure of an informant's identity to a prosecutor did not violate the informant's constitutional rights. *Summar*, 157 F.3d at 1059 n.2 ("reject[ing] the proposition" that a police officer's act of disclosing an informant's identity to a prosecutor could "substantially increase the likelihood that a private actor would deprive [the informant] of [his] liberty interest in personal security") (citing *Kallstrom*, 136 F.3d at 1067). The Court holds that Hudgins would be entitled to qualified immunity for this reason alone.

As the party with the burden to prove that his right was clearly established, Millinder need not cite a case "on all fours," just a case "with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." *Vanderhoef v. Dixon*, 938 F.3d 271 (6th Cir. 2019) (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)). Millinder cites only two Sixth Circuit decisions pertaining to the state created danger doctrine and the disclosure of personal identifying information. Millinder argues that one is analogous and the other is distinguishable. The Court finds, however, that neither decision shows that Millinder's right was so well established that Hudgins knew or should have known his actions were unlawful.

In *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), the City of Columbus granted a defense attorney's open records request for the full personnel files of three undercover police officers who had conducted an undercover narcotics investigation of a violent gang and would testify against the attorney's client at trial. *Kallstrom*, 136 F.3d at 1059. The personnel

files contained the address, social security number, and telephone number of each officer and telephone numbers of the officer's immediate family; copies of each officer's driver's license; the names and addresses of each officer's employment references; and each officer's bank account information. *Id.* The Sixth Circuit held that the officers had a privacy right in the information guaranteed by the Due Process Clause of the Fourteenth Amendment, specifically their right to personal security and bodily integrity in light of the gang's known propensity for violence. *Id*. at 1062. The Court of Appeals also concluded that the municipal government's policy of releasing the personnel files to defense counsel as part of an opens records request was not narrowly tailored to further a compelling state interest. *Id*. at 1066. Under the particular facts of the case, the *Kallstrom* panel held that the undercover officers had a § 1983, state created danger claim against the city for the violation of the officers' Fourteenth Amendment rights. *Id*. at 1067.

The Court finds that *Kallstrom* did not clearly establish Millinder's constitutional right against the disclosure of his identifying information by a police investigator to a prosecutor. *Kallstrom* arguably involves a class of plaintiffs similar to informants or tipsters: undercover police officers. Like an informant, an undercover officer performs a role in criminal investigation that comes with significant risk to the officer's personal safety. Like Millinder, the undercover officers had their private, identifying information disclosed without their consent to an attorney representing the very suspect they had implicated by their participation in a criminal investigation. But any similarities end there. The disclosure of an undercover officer's personal information to a defense attorney can hardly be described as similar to the disclosure of an informant's identity to a prosecutor. Unlike Millinder, the police officers in *Kallstrom* sued the City of Columbus, the actual party which had disclosed their information to the defense attorney.

There is no dispute that Hudgins did not reveal Millinder's identity to the suspects in this case; the DA did. The distinction matters because the clearly established prong of the qualified immunity analysis turns on what an official in Hudgins's position as a police investigator knew or should have known about his conduct. Because Hudgins sat in a very different position than the disclosing municipality in *Kallstrom*, the decision would have not put a reasonable police investigator on notice of his responsibilities to an informer.

The other case cited by Millinder fares no better. In *Barber v. Overton*, 486 F.3d 449 (2007), the Michigan Department of Corrections released the social security numbers and birth dates of several correctional officers to prisoners held in a maximum-security facility. *Barber*, 486 F.3d at 450. The prisoners had filed administrative grievances against the officers and in the course of those proceedings received a copy of an internal affairs report containing the correctional officers' names, social security numbers, and dates of birth. *Id.* Using the officers' personal identifying information, prisoners engaged in a sustained campaign of threats and harassment against the officers and members of the officers' families. *Id.* at 451. The officers brought suit under § 1983 against the prison officials who had failed to properly redact the personal identifying information from the internal affairs report before producing a copy of the report to the prisoners. *Id.*

The Court of Appeals concluded that the prison officials were entitled to qualified immunity from the correctional officers' state created danger claims because the officers could not prove a violation of their due process rights. The panel held that the disclosure of social security numbers and birthdates did not implicate the correctional officers' privacy, reasoning that prisoners could discover many personal facts about a correctional officer from publicly available information without resort to the officer's social security number or birth date. *Id.* at

456–57.  The panel also suggested that the risk of harm to a correctional officer was not so substantial as to amount to a state created danger, at least when compared to *Kallstrom* and the disclosure of an undercover police officer's identity to a criminal gang, which the undercover officer had infiltrated.  *Id.* at 457.

Although Millinder argues that *Barber* is distinguishable from *Kallstrom*, the distinctions do little to support Millinder's position.  Factually, the disclosure of a correctional officer's private information to a prisoner and the disclosure of an informant's information to a district attorney are similar in only the most general sense.  *Emmons*, 139 S. Ct. at 503 (cautioning that a right must be defined with specificity and not at a high level of generality).  Moreover, the Sixth Circuit actually concluded that the state's disclosure of the correctional officers' private information did not violate the Constitution or make out the elements of a state created danger claim.  If a correctional department's inadvertent production of private information directly to prisoners did not violate a correctional officer's Fourteenth Amendment rights, it is difficult to discern how a reasonable officer in Hudgins's position knew or should have known that his disclosure of an informant's identifying information to a district attorney (or even the DA's possible disclosure to the defense) would violate the informant's rights.

Not only do *Kallstrom* and *Barber* fail to support Millinder's qualified immunity argument, other cases decided since 2016 underscore the fact that Millinder's right to have Hudgins protect his identity from disclosure was not clearly established.  In *Przybysz v. City of Toledo*, 746 F. App'x 480 (6th Cir. 2018), an informant gave police the name of his drug dealer and assisted in two controlled buys.  *Przybysz*, 746 F. App'x at 482.  When police arrested the drug dealer after the second buy, one of the officers told the dealer that he had "just sold to an undercover cop," allowing the dealer to piece together the identity of the informant.  *Id.* at 483.

There was no evidence showing which of the arresting officers had made the comment to the drug dealer or that any officer had actually named the informant. *Id*. Notably, the Court of Appeals declined to "lightly extend [the state created danger doctrine], in view of the many circumstances in which criminal suspects and criminal defendants cooperate with the government." *Id*. at 483–84. The Sixth Circuit concluded that the officer was entitled to qualified immunity on the state created danger claim because "there is no legal authority on point (let alone clear legal authority) . . . ." *Przybysz*, 746 F. App'x at 484. While *Przybysz* was decided after the conduct alleged in this case and rested on a very different set of facts, the case illustrates two points: (1) that the contours of an informant's constitutional right in a state created danger case can be highly fact-dependent and (2) that more than a general factual similarity is required in order to show that a right was clearly established.

And nothing about the Sixth Circuit's decision in *Nelson v. City of Madison Heights*, 845 F.3d 695 (6th Cir. 2017) changes the outcome in this case. *Nelson* held that a police officer was not entitled to qualified immunity where the officer disclosed the identity of an informant directly to a suspect at the time of an arrest. The informant in *Nelson* had volunteered to work as an informant and assisted police in making a drug arrest. *Nelson*, 845 F.3d at 698. After signing a form indicating that the police would "use all reasonable means to protect your identity" but could not guarantee it, the informant called her dealer and arranged a buy. *Id*. at 698. When police intercepted the dealer and an accomplice on their way to the make the sale, the arresting officer said to the accomplice that he was the person who had ordered the drugs over the phone, allowing the dealer and the accomplice to figure out the identity of the informant. *Id*. Four days later, the informant was murdered. *Id*. at 699.

Like *Przybysz*, *Nelson* was decided after the events in this case and therefore would not have put an officer in Hudgins's position on notice that his actions violated clearly established law. Moreover, *Nelson* never actually reached the "clearly established" prong of the qualified immunity analysis. The panel only considered whether genuine issues of fact remained about the causal connection between the officer's offhand remark and the informant's murder as well as the officer's culpable frame of mind. While *Nelson* is instructive, it does not show that Hudgins had "fair and clear warning" about the consequences of his action. *Vanderhoef*, 938 F.3d at 271. In the absence of clear authority, the Court holds that Hudgins is entitled to qualified immunity on Millinder's state created danger claim.[5]

## III.     Supplemental Jurisdiction

This leaves Millinder's other claims under Tennessee law. The Court has discretion to take jurisdiction over these claims only by virtue of 28 U.S.C. § 1367(a), which grants district courts "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

Having now dismissed the claims over which it has original subject-matter jurisdiction, the Court must next determine whether it should exercise supplemental jurisdiction over Millinder's state law claims. "With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). "[I]f there

---

[5] It is not clear to the Court whether Millinder even alleged a § 1983 claim against Decatur County. Count 1 of the Complaint alleges that Hudgins violated Millinder's constitutional rights but does not allege the elements of a § 1983 claim against the County. Either way, without proof of a constitutional violation, Decatur County would also be entitled to judgment as a matter of law on a § 1983 claim.

is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims." *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2012) (*Campanella v. Commerce Exch. Bank,* 137 F.3d 885, 892 (6th Cir. 1998)). However, district courts may decline to exercise supplemental jurisdiction over a related claim if any of the following circumstances apply:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Even when one of these statutory conditions applies, the district court may nevertheless exercise supplemental jurisdiction over state law claims "if recommended by a careful consideration of factors such as judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). The district court enjoys "broad discretion" in this regard. *Phaneuf v. Collins,* 509 F. App'x 427, 434 (6th Cir. 2012) (citing *Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1254 (6th Cir. 1996)).

The Court declines to exercise supplemental jurisdiction over Millinder's remaining claims under Tennessee law. "When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims." *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 597–98 (2018). In this case, Millinder's Fourteenth Amendment state created danger claim under § 1983 was the basis of the Court's federal question jurisdiction under 28 U.S.C. § 1331. The Court has concluded that Defendants are entitled to judgment as a matter of law on that claim. Under the circumstances, the Court

declines to retain jurisdiction over Millinder's Tennessee law claims. Therefore, the Court **DISMISSES** those claims without prejudice to re-file them in the courts of the state of Tennessee.

**CONCLUSION**

Defendants' Motion for Summary is **GRANTED**. Millinder has failed to carry his burden as to all of the elements of his Fourteenth Amendment state created danger claim. Even if he had, the Court holds that Hudgins is entitled to qualified immunity on the claim. The federal constitutional claim against Hudgins is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Millinder's remaining claims under state law pursuant to 28 U.S.C. § 1367(c)(3). Those claims are dismissed without prejudice.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: October 21, 2019.